UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONOVANN BRASWELL,            )
                 Plaintiff,            )
                                   )        No. 1:15-cv-1336
-v-                                )
                                   )        HONORABLE PAUL L. MALONEY
SEAN MCCAMMAN AND NATHAN MEAD,)
                 Defendants.        )
_____)

## OPINION

On a late summer night in 2014, the City of Grand Rapids received a 911 call from a very concerned resident who identified herself to dispatch. She provided ample detail: A group of young men, with one black, teenage male wearing white and possessing a gun, was congregating in her neighborhood on bikes. The caller reported that it appeared, from her view, the suspect had a gun in his waistband and others agreed; according to the caller, a group of neighbor kids dared not to "walk up the hill" because they "saw a gun."

A call for help to respond to a gun in this distressed neighborhood—the worst of the worst in terms of violent crime in a city of 200,000—was unfortunately both routine and dangerous for officers.

When officers located a group matching the caller's description, one immediately recognized Jaylen Braswell—a person known for his involvement in prior shootings. His brother, Donovann, wearing white and digging in his waistband, matched the description of the suspect with the gun.

When officers ordered the group to stop, everyone complied except Donovann Braswell—who took off in headlong flight. An extensive chase ensued through many yards and over many fences. Officer Sean McCamman—who arrived on the scene late but had listened to radio and dispatch accounts of the 911 call and chase—observed another officer draw his gun, but Braswell continued to sprint away. Officer McCamman finally caught up to Braswell in a narrow corridor between a fence and house. Braswell started to climb the fence, and Officer McCamman threw him to the ground. Braswell landed face down and his hands were near his waist area. Officer McCamman, fearing for his safety, ordered Braswell to show his hands not once, but twice . . . .

* * *

To this point in the continuum of incident, despite Plaintiff's attempt to contort the record, the Officers were fully justified in their actions—and no constitutional violation occurred. Officers clearly had sufficient reasonable suspicion to justify a show of force and attempt a *Terry* stop and seizure. However, mindful that the Court must view the facts in the light most favorable to Braswell, a less clear record of subsequent law enforcement action must be scrutinized.

* * *

After Braswell refused to comply with McCamman's second order to remove his hands from his waistband area, McCamman acted to protect himself. McCamman, who cupped his flashlight in his hand, forcefully struck Braswell in the back of the head with the flashlight—an application not disputed on this record as deadly force. Braswell immediately felt pain and placed his hands on the back of his head to shield himself. Common sense and

instinct support—and photographs corroborate—Braswell's account. McCamman continued to hit Braswell in the back of his head and the back of his (empty) hands not once, not twice, but three more times.

Officers who put themselves in danger to keep our communities safe "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Nevertheless, "[e]ven a split-second decision, if sufficiently wrong, may not be protected by qualified immunity"; and "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007); *see id.* at 889 ("[W]hether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses *at that moment*.").

The Court must reach this resolution because while the record reflects Braswell's recklessness, a jury could accept Braswell's version of the facts and conclude McCamman's repeated, forceful strikes to Braswell's head and hands, even after Braswell no longer posed a serious threat, violated Braswell's Fourth Amendment right to remain free from excessive force. Reckless conduct does not justify an unjustified application of force.

Accordingly, while Defendants' motion must be granted as to Plaintiff's Fourth Amendment claims for unlawful search, arrest, and property seizure, factual disputes preclude summary judgment on Plaintiff's Fourth Amendment excessive force claim and state-law battery claim against Officer McCamman.

## I.  BACKGROUND[i]

On June 13, 2014, Plaintiff Donovann Braswell, a fifteen-year-old black male, was walking along Dolbee Avenue in Grand Rapids, Michigan. (ECF No. 77 at PageID.437.) At approximately 9:00 p.m., he ran into four friends. (*Id.* at PageID.507; ECF No. 77-3 at PageeID.507.)

Less than an hour later, Officers Mead and Thompson were summoned to the area of Dolbee Avenue SE and Dunham Street SE. The dispatch was in response to a 911 call; a woman who identified herself as Crystal Bobo had the following exchange with dispatch:

> Caller: I need a police officer on the corner of . . . Dolb[ee] and Dunham. It looks like a little boy got a gun in his waistband. I don't know, but some people's walking up the street saying he has a gun.
> Dispatch: Did you see it or you just heard people talking about it?
> Caller: I heard people talking about it and then he keep holding his waist line. I don't know.
> Dispatch: Okay. What does he look like, is he white, black, Hispanic?
> Caller: He's black with a white shirt on and some blue jeans, and there's a group of them right at the corner.
> Dispatch: Okay. And about how old is he, do you know?
> Caller: He look like he's about 17, 18 years old. They don't see me, but I can see them.
> Dispatch: And it was some neighbors that you heard saying this?
> Caller: Yeah, some people walking down the street. They're all on a corner house, on a porch—sitting on a porch.
> Dispatch: And do you—do you see a weapon or do you just see him like messing around with his waistband?
> Caller: Well, some people's was up there, and they was scared to walk up the hill. They were like he look like he has a gun. I can't see anything. But a group of kids was saying he has a gun.
> . . . .

[i] Plaintiff has stipulated to the dismissal of his *Monell* claim (Count III), his prosecution without probable cause claim (Count II), his malicious prosecution claim under state law (Count V), his failure to intervene claim against Officer Mead and all claims against Officer Thompson. (*See* ECF Nos. 92, 97–98.)

Dispatch: Okay. And you see like a big group of people there?

Caller: Uh-huh, about like seven, eight little boys on bikes.

Dispatch: Does he have a bike with him?

Caller: Uh-uh, not that I know of.

Dispatch: So the neighbor—do you know if—I already have the call put out, so we're going to have help out there, I just want to ask a couple more questions before they get there. The neighbors that said that—they actually said they saw it then?

Caller: Well, one of them did, they was walking up the street. It wasn't a neighbor. It was some guys walking up the street saying oh, he has a gun. They getting ready to ride off on the bikes.

Dispatch: Okay. Let me know which direction they go if they do ride off on the bikes.

Caller: They—if they go down any direction, they coming down Dolb[ee] Hill, Sherman (inaudible) to Baxter.

Dispatch: Towards Sherman Street?

Caller: Yeah, if they going to riding down—if they going to ride down hill, that's where they most likely going to go.

Dispatch: Do you know, does he have a bike, did you say yes or no?

Caller: Yeah, he's on a bike now.

Dispatch: What color bike, can you tell?

Caller: I can't really tell. Like I said, I can see them but they can't see me because I'm standing on my porch.

Dispatch: Just let me know if you see anything, okay?

Caller: Uh-uh.

Dispatch: Or if they do leave. We do have officers on the way.

Caller: Okay. Coming in my house, my daughter (inaudible).

Dispatch: Do you know who any of these people are at all, or are they just—

Caller: Huh?

Dispatch: Do you know any—who these people are at all, like any of their names or—

Caller: No.

Dispatch: —anything like that?

Caller: No, never seen these little boys in my life, never. And I'm sick of this chaos that's going on at the top of this hill. Okay, I'm going back on my porch. They riding off. It's one, two, three, four riding off down Dolb[ee] Hill all the way to Baxter.

Dispatch: Going towards Baxter northbound?

Caller: Yeah.

Dispatch: Okay. They are heading that way?

Caller: Okay. There's one—he has a little boy on the front—front handlebars of the bike with a red hoodie.

Dispatch: That's the one with the possible weapon?

Caller: Yeah.

Dispatch: Is he the one that's on the handlebars?

Caller: Yeah—no.

Dispatch: Or he has somebody on his handlebars.

Caller: He has—yeah, yeah.

Dispatch: Okay. Do you still see them out there or they—they went—

Caller: No, they—yeah, they gone.

Dispatch: Okay. All right. We have officers on the way out there to check the area out. Just call us back if you see anything else, okay?

Caller: Okay. Thank you so much.

Dispatch: You're welcome. Bye.

Caller: Yep, bye-bye.

(ECF No. 76-3 at PageID.351–56.)

Dispatch relayed the report to officers, reporting a "suspicious situation at Dolb[ee] and Dunham." (ECF No. 76-4 at PageID.359.) Dispatch relayed the "report of a black male with a white shirt and blue jeans at the corner who possible has a gun on him": "[h]e is with a group of seven to eight other males and now he may be getting on a bike getting ready to leave." (*Id.*) Dispatch also noted an individual wearing a "red shirt" who the caller said was riding on the suspect's handlebars.

The responding officers approached with a heightened sense of alert—and understandably so. This 911 call required responding to a report of "individuals [who] possibly ha[d] guns" in a "very high crime area"—indeed, "typically the highest in violent crimes" in the City of Grand Rapids, rife with "gun violence, gang violence, and drug violence." (ECF No. 76-5 at PageID.384.)

While canvassing the area for the suspect, Officers Thompson and Mead observed a group of individuals walking, including "an individual wearing a white shirt or sweatshirt with blue jeans, and also, an individual wearing a red shirt . . . walking next to a bike at that time, which *matched the description given by the caller*." (ECF No. 76-5 at PageID.374–75 (emphasis added).) The dispatch record confirms this contemporaneous identification: "suspect description[:] black male, white sweatshirt, blue . . . jeans . . . ." (*Id.* at PageID.361.)

Officer Mead also noticed that two of the individuals were wearing sweatshirts, which was "unusual in June." (*Id.* at PageID.375.) Officer Thompson identified Jaylen Braswell, Plaintiff Donovann Braswell's brother, who was previously "involved in a couple shootings." (ECF No. 76-6 at PageID.394.) He relayed this information to Officer Mead. (*Id.*.)

The two officers approached the group while turning on a spotlight for better vision because "it was dusk at the time." (*Id.*) Immediately, Donovann Braswell, who admitted he was wearing "a white [sweat]shirt and some blue cargoes" at that time, fled in a headlong sprint through the residential area. (ECF No. 77 at PageID.349.)

According to Braswell, he recalls hearing officers telling him to stop, but admits that he kept running and "was going so fast." (ECF No. 77 at PageID.439.) Officer Mead pursued Braswell on foot, telling him to stop several times. (ECF No. 76-5 at PageID.375–76.) Officer Mead noticed that Braswell was "digging in the front of his body, left side of his waistband as he [was] running," which was "abnormal for somebody running," and which further led him "to believe at that time [Braswell] was armed with some sort of weapon." (*Id.*) Officer Mead radioed to other officers indicating that Braswell was digging in his waistband while running. (*Id.*)

Shortly after the chase began, by his own admission, Braswell removed his baseball cap and his white sweatshirt and discarded them. (ECF No. 77 at PageID.439.)

Officer Manser arrived in the area and started chasing Braswell. (ECF No. 76-5 at PageID.377.) Both Officers Mead and Manser told Braswell to stop, but when Braswell reached a fence, he jumped it and continued. (*Id.*) Officer Mead was unable to scale the fence and lost sight of Braswell, although he heard a "loud thud" on the other side, leading him to believe that Braswell's body had hit the ground. (*Id.* at PageID.385.)

Officer McCamman arrived in the residential area and spoke with Officer Manser, who advised where he last saw Braswell. While Officers Manser and McCamman looked for Braswell, Officer Manser observed him near a home on Diamond Street. (ECF No. 77-1 at PageID.477.) At that point, Officer Manser drew his gun and told Braswell to get on the ground. This "elevated [Officer McCamman's] thought process a little bit" because he had worked with Officer Manser, and "knew there would be a reason he would do that." (*Id.*)

Braswell continued to run despite hearing officers ordering him to get on the ground. At this point, Officer McCamman took up the chase. (ECF No. 77 at PageID.440; ECF No. 77-1 at PageID.478.)

Braswell jumped three more fences, and Officer McCamman followed Braswell over each fence. (ECF No. 77-1 at PageID.478.) Officer McCamman was aware of the nature of the call as a suspect with a firearm and that Braswell "was observed with or grabbing at his left side area." McCamman "was in fear for his safety," so he drew his firearm." (*Id.*) Officer McCamman, like Officer Mead, observed Braswell grabbing at his waistband. (*Id.*) He gave commands for Braswell to stop, and he continued to ignore them.

Since "it was getting dark, it was cloudy, and [they] were under tree cover," Officer McCamman struggled to see Braswell. Thus, he used his "flashlight to illuminate" Braswell. (*Id.*) Officer McCamman observed Braswell gain access into the backyard of a home on Logan—and ended up in a very narrow corridor between a tall fence and the home. (*Id.*) Braswell tried to scale this fence, but was unsuccessful and "there was [sic] police on each side of it, so [he] stopped." (ECF No. 77 at PageID.440.)

Officer McCamman caught up to Braswell, pulled Braswell off the fence, and threw him on the ground. (ECF No. 77 at PageID.441; ECF No. 77-1 at PageID.478.) Braswell landed "facedown in the dirt" and Officer McCamman landed in a very narrow location between Braswell and the house. (ECF No. 77 at PageID.441; ECF No. 77-1 at PageID.479; ECF No. 77-2 at PageID.503.)

When they first fell, Officer McCamman saw that Braswell's hands were underneath his body near his waist area. (ECF No. 77-1 at PageID.479.) Braswell does not rebut this and concedes that he does not recall the position of his hands at that point. (ECF No. 77 at PageID.441.) Officer McCamman ordered Braswell to show his hands, but Braswell refused and his hands remained in his waistband. (*Id.*) Again, Braswell does not recall the placement of his hands at this point in time.

Meanwhile, Officer Thompson was on the other side of the fence, and he could not assist Officer McCamman because there was "no way to open the fence." (ECF No. 76-6 at PageID.397.) Officer Thompson recalls another officer telling him to "rip the fence open, rip the fence open." (*Id.*) It took approximately 30 seconds to rip the fence down.

Thus, forced to handle Braswell on his own, Officer McCamman feared for his life and believed "at that point that [Braswell] had a firearm in his waistband." (ECF No. 77-1 at PageID.485.) "[K]nowing the short amount of time it would take [Braswell] to pull" a firearm and use it, Officer McCamman "made a split second decision" to strike Braswell on the head four times with a flashlight cupped in his hand. (*Id.*) Officer McCamman delivered each strike in quick succession. (*Id.* at PageID.499.)

However, according to Braswell, he "tried to put [his hands] on top of [his] head." (ECF No. 77 at PageID.441.) "[A]s soon as I felt the first blow," Braswell testified, "that's when I put my hands on top." (*Id.* at PageID.441.) In other words, he "tried to guard [his] head once [he] got hit." (*Id.*) He confirms that he "got hit in [his] hands," but does not know how many times.

Braswell's hand injuries, as reflected in a photograph taken at the hospital after his arrest, supports his testimony. Likewise, Braswell's head injuries, as reflected in photographs taken after Braswell's arrest, were confined to areas above and below where his hands would have been. These photographs support Braswell's testimony and call into doubt at least some of McCamman's testimony. (ECF No. 92-3.)

When viewing the photographs and accepting the testimony in the light most favorable to Braswell, the evidence confirms McCamman struck Braswell in the head with a flashlight at least three times after Braswell had put his hands on the back of his head.

## II.    LEGAL FRAMEWORK

### A.    Legal Framework: Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing a genuine issue for trial exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson,* 477 U.S. at 249).

## B.     Legal Framework: Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is a legal question for the Court to resolve. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway*, 501 U.S. 510, 516 (1994)). When resolving an officer's assertion of qualified immunity, the court determines (1) whether the facts the plaintiff has alleged or shown establishes the violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (citing *Pearson v. Callahan* 555 U.S. 223, 232 (2009)). Courts may examine the two prongs in any order, depending on the facts and circumstances of the case. *Id.* at 567-68.

Once the qualified immunity defense is raised, the plaintiff bears the burden of demonstrating both that the challenged conduct violates a constitutional or statutory right and that the right was so clearly established at the time that "'every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether a law is clearly established, ordinarily this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) ("When determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals."); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Ordinarily, the right must be clearly established in a particularized sense, and not at a general or abstract sense. *Id.* at 640. Ordinarily, "[t]his standard requires the courts to examine the asserted right at a relatively high level of specificity and on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997)).

However, on the other hand, the Sixth Circuit recently affirmed that "reading the[] cases together, the Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015). Thus, "[w]hile it is apparent that courts should not define clearly established law at a high level of generality, it is equally apparent that this does not mean that 'a case directly on point' is required"; the question is, again, whether "precedent [has] placed the statutory or constitutional question beyond debate." *Id.* (citing *al-Kidd*, 563 U.S. at 741).[2]

---

[2] The Eleventh Circuit puts it this way with respect to certain cases:

## III.  ANALYSIS

As a threshold matter, the Court must admonish Plaintiff's counsel. Plaintiff's response brief makes repeated exaggerated or even erroneous assertions that distort the record—even in the light most favorable to Plaintiff.

### "[N]one of the information from dispatch reflected what the officers encountered."

This statement is flatly false. Officers encountered a group of young men who matched the description of the caller, including the suspect wearing white who immediately fled, in a location consistent with the caller's report. Bikes were also present, as reported.

### "It is clear that the caller, not known to the officers, only heard about a gun from some unknown source, and referenced that the individual with the gun was on a bicycle and wearing a red sweatshirt."

First, whether the 911 caller was known to the Officers matters not, and the Court will discuss this more later. While the caller cited another source who directly witnessed a gun,

---

When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional *without tying* that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation. These judicial decisions can control 'with obvious clarity' a wide variety of later circumstances.

*Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002); *see U.S. v. Lanier*, 520 U.S. 259, 271 (1997) (noting that in some instances "a general constitutional rule in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful"). In *Hope v. Pelzer*, the Supreme Court clarified the reach of *Lanier*:

Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

536 U.S. 730, 741 (2002); *see also Baynes*, 799 F.3d at 612–13 ("[R]eading the[] cases together, the Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'").

she also said that a group of neighbor kids was scared to approach Donovann's group because of the gun. The caller also based her belief that a gun was present on her personal observation: "It looks like a little boy got a gun in his waistband." (ECF No. 76-3 at PageID.351.) The caller did not report the individual who wore a red sweatshirt had the gun. The caller was clear that the individual with the white shirt had the gun, and another person who had a red sweatshirt rode on the same bike on the handlebars. The caller made perfectly clear her belief that the person who allegedly had the gun was a young black male who wore blue pants and a white shirt.

**"[T]he caller had indicated that the individual with a gun was wearing a red sweatshirt, on a bicycle with another person on the handlebars, none of which fit the description of Donovann."**

Again, this is not true. The caller distinguished the person on the handlebar, the one who wore red, from the person who possessed the gun, the one who wore white.

**"The caller . . . gave contradictory descriptions of the alleged gun-possessor, none of which matched Donovann who was not on a bicycle and was not wearing a red sweatshirt or white t-shirt."**

The caller did not give contradictory descriptions of the alleged gun-possessor. Moreover, Donovann *was* wearing white—and he discarded his white sweatshirt while running. He admitted this in his deposition.

**"Defendants assert that Donovann 'matched the description given by the caller' of 'an individual wearing a white shirt or sweatshirt with blue jeans . . . ,' despite the incontrovertible fact that Donovann was wearing a blue t-shirt on the evening in question, as evidenced by the photos police officers took at the scene."**

Finally, in a fit of irony, Plaintiff's counsel distorts the record in the same breath as accusing Defendants' counsel of distorting the record.

Braswell *removed his white sweatshirt during flight* by his own self-admission. Accusing Defendant of distorting the facts by citing a photograph of Donovann *after* he removed his white sweatshirt by his own admission is incredibly disingenuous.

> Q: Help me understand something. When you started running, you were wearing a white sweatshirt?
> A: Yes.
> Q: And by the time you were apprehended by the police, you had on a different color, what, undershirt, T-shirt?
> A: Yes.
> Q: And what was the color of the T-shirt that you ended up in when you got caught?
> A: Blue.

### A. Count I (Fourth Amendment: Unreasonable Stop, Seizure, and Arrest) (Officers Mead and McCamman)

Count I of Plaintiff's Complaint asserts a claim based upon an alleged unreasonable stop, seizure, and arrest against Officers Mead and McCamman.

"A seizure occurs where, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "An officer may conduct a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. Calif.*, 551 U.S. 249, 254 (2007). Put simply, there is no seizure when a suspect flees until he is physically restrained. *See Calif. v. Hodari D.*, 499 U.S. 621, 626 (1991).

Courts recognize three categories of seizure that each have a different level of scrutiny. *Smoak*, 460 F.3d at 779-81; *see Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). An

investigatory *Terry* stop requires reasonable suspicion that criminal activity is afoot; a *Terry* frisk requires reasonable suspicion that the suspect stopped is armed and dangerous; and an arrest requires probable cause that a crime has occurred. *See Johnson*, 555 U.S. at 326–27. Because Plaintiff has alleged violations under the Fourth Amendment throughout the pursuit to Braswell's eventual arrest, the Court will address each stage separately.

### 1. *Terry* Stop and Pursuit

An officer may conduct a *Terry* stop if the officer "possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts." *Smoak*, 460 F.3d at 778. In other words, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

"Reasonable suspicion depends on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Navarette v. Calif.*, 134 S. Ct. 1683, 1690 (2014) (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," *id.*; "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.*

In this case, the Officers not only were in a high-crime area—they responded to a 911 call reporting a group of kids, one of whom had a white shirt on and allegedly carried a gun in his waistband. The caller, Crystal Bobo, identified herself to dispatch (which does not make her an anonymous caller as Plaintiff argues[3]), and although there was some ambiguity in whether she personally saw a gun, she noted that it looked like he had a gun in his waistband and the neighborhood kids were afraid to approach the group because they had seen a gun. The identified caller's report contained ample detail and was based on her personal observations of Braswell himself and others who were scared to approach Braswell and his friends. Moreover, when the police spotted the group, the caller's description of the group, including Braswell, not only matched—it gave the caller's information credibility.

"Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. . . ." *Wardlow*, 528 U.S. at 124.

Under the facts of *Wardlow* alone, officers clearly had reasonable suspicion under the totality of the circumstances to effect a *Terry* stop. Indeed, the facts presented to officers gave even more reasons to effect a *Terry* stop than the facts in *Wardlow* and a subsequent Sixth Circuit case, *Lee v. Hefner*, 136 F. App'x 807, 811–12 (6th Cir. 2005) ("[T]he presence in a high crime area, plus evasive behavior, can constitute reasonable suspicion."). Officers

---

[3] All of the case law Plaintiff cites concerning "anonymous tipsters" is inapt; Crystal Bobo was not anonymous. *See, e.g., United States v. Long*, 464 F.3d 569, 573 (6th Cir. 2006) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)) (affirming the magistrate judge's determination that the caller who identified herself to dispatch "counted as a known citizen as opposed to an anonymous tipster"); *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)) ("[F]or purposes of determining whether the *Terry* stop was reasonable, we must impute to the individual officers the dispatcher's knowledge . . . ."); *see id.* ("[I]f the dispatcher had sufficient information to find reasonable suspicion for a *Terry* stop, the stop was permissible.").

were not on a late-night fishing expedition; they responded to a detailed 911 call in a high-crime area and Braswell, who matched the description of the individual who allegedly had a gun in his waistband, immediately took off in headlong flight. *See Wardlow*, 528 U.S. at 124.

Thus, this is not even a close call—the Officers clearly had reasonable suspicion to stop and pursue Braswell and remain entitled to qualified immunity on that claim. And again—since Braswell fled, a seizure was not even effected until Officer McCamman subdued Braswell on the ground. *See Cortez*, 449 U.S. at 417. Thus, no constitutional violation occurred during the attempted *Terry* stop and pursuit.

### 2. Reasonable Suspicion Justifying the Use of Force during the attempted *Terry* Stop

Next, the analysis must turn to whether there was reasonable suspicion justifying the use of force during Braswell's flight.

"This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001); *accord United States v. Lindsey*, 114 F. App'x 718, 721 (6th Cir. 2004); *see, e.g., United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982) ("[T]he use of guns in connection with a [Terry] stop is permissible where the police reasonable believe they are necessary for their protection."); *accord United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014).

In this case, the factual record clearly supports the conclusion that Officer McCamman and his colleagues had reasonable suspicion to believe Braswell was armed and dangerous and that the show of force was necessary for the Officers' protection. The Officers

responded to a detailed report of a person with a gun from an identified 911 caller; the area in which officers responded represented the "worst of the worst" in terms of being a high-crime area in the City of Grand Rapids; Officer McCamman watched at least one other officer bear his firearm in response to Braswell's behavior; Braswell's brother, who was in the group of kids, had previous involvement in shootings in that area; Braswell consistently grabbed at his waistband; and Braswell recklessly continued to flee from officers even after repeated commands to stop.

Every officer on the scene that night felt Braswell was armed and dangerous during the pursuit. Indeed, Braswell himself never denied that he was armed during the pursuit, instead choosing to invoke the Fifth Amendment when asked about possessing the gun that was found along his flight path and near the base of a fence Braswell scaled during the chase. (*See* ECF No. 77 at PageID.420; ECF No. 77-3 at PageID.508); *cf. S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof.").[4]

To this point in time, the Court cannot conclude that any officer was unreasonable as a matter of law. And ultimately, as the Court will discuss further, Officer McCamman had probable cause to arrest Braswell for failing to obey McCamman's lawful order.

---

[4] Ultimately, the Court does not draw a negative inference because it is not necessary to resolve this motion. Officers had ample reasonable suspicion to believe that Braswell was armed—whether or not, in fact, he was armed. The Court will note, however, that Defendants have submitted evidence that Braswell possessed the gun found on the scene, whereas Plaintiff never denies possessing the gun and presents no controverting evidence in this regard. *See Colello*, 139 F.3d at 677.

### 3. Probable Cause for Arrest[5]

Finally, there was probable cause to ultimately arrest Braswell.

A warrantless arrest by a police officer is reasonable if "there is probable cause to believe that a criminal offense has been or is begin committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). It is not necessary that the crime for which there is probable cause be the same as the stated crime of arrest. *Id.* at 155. Probable cause exists when "at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed an offense." *Lilly v. City of Erlanger*, 598 F. App'x 370, 376 (6th Cir. 2015).

Even if the Court assumes that Officer McCamman effected an "arrest" immediately after Braswell was subdued on the ground,[6] there was probable cause to believe that Braswell had unlawfully resisted and obstructed. *See* MCL 750.81d(1), (7)(A). "[T]he law can be violated . . . by refusing to comply with a lawful command without using force." *Brooks v. Rothe*, 577 F.3d 701, 707 (6th Cir. 2009). In contrast to *People v. Moreno*, 814 N.W.2d 624 (2012)—which merely held that a person has a right to resist an *unlawful* command—the Officers' commands to stop based on their reasonable suspicion that criminal activity was afoot were unquestionably lawful.

---

[5] As an initial matter, Officer Mead did not participate in Braswell's frisk or arrest. Accordingly, he cannot be liable for any constitutional violation arising from the arrest. *See, e.g., Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005).

[6] For purposes of this motion, the Court need not decide precisely where the seizure "ripen[ed] into an arrest and thus require[d] probable cause." *Lindsey*, 114 F. App'x at 721. If that point was not until after Braswell was placed in handcuffs and officers located the firearm along Braswell's flight path, then clearly probable cause existed for possession of a firearm by a person less than eighteen years of age, *see* Mich. Comp. Laws § 750.234f(1), and possession of a concealed pistol without a license, *see* Mich. Comp. Laws § 750.227(2).

At this point, the Court must point out an important absence in any dispute of material fact: Officer McCamman ordered Braswell to show his hands while on the ground, and Braswell initially refused to do so. (*Compare, e.g.*, ECF No. ECF No. 77-1 at PageID.479 ("When he fell, his hands fell underneath him at his waist area. It was my belief that he was armed at that point . . . . I gave him his commands to show me his hands, put his hands behind his back. I gave him two commands. He did not, at which point I struck him . . . .") *with* ECF No. 77 at PageID.441 (Q: "[D]o you recall if the officer asked you to put your hands—or to show him your hands or to put your hands behind your back? A: I don't remember. . . . Q: "Is it your memory you were hit in the head before you put your hands behind you? A: Actually, like as soon as I felt the first blow, that's when I put my hands on top.").)

Braswell did not deny his hands were near his waistband; he did not deny he failed to obey Officer McCamman's two commands to show his hands. Simply put, he has not "submitted any . . . controverting evidence in this regard." *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 (5th Cir. 2016), *cert. denied* 581 U.S. __ (2017).

Thus, and crucially, Braswell's failure to obey Officer McCamman's initial, lawful orders to show his hands formed a separate independent basis for probable cause under this statute. *Cf. Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cty.*, 542 U.S. 177, 187 (2004) ("A state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures."). When officers "reasonably believe [force] [is] necessary for their protection," they may indeed use force in the context of a *Terry* stop, *see, e.g., Merritt*, 596 F.2d at 1273.

Ordering a suspect to show his hands is implicit in the lawful authority to "handcuff" the suspect "to effect a stop." *See Heath*, 259 F.3d at 530. It would be strange, indeed, if an officer who had the lawful authority to handcuff a suspect lacked the lawful authority to order the suspect to show his hands to begin with.

Finally, at a minimum, there was no clearly established law saying that a person's failure to obey an officer's lawful order to stop and show his hands for a *Terry* investigation does not constitute probable cause as a matter of law in Michigan.

### B.    Count I (Fourth Amendment: Excessive Force) (Officer McCamman)

Count I of Plaintiff's Complaint also asserts a claim against Officer McCamman for "unreasonable and excessive force."

Excessive force claims are analyzed under the Fourth Amendment's reasonableness standard, which looks to "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Connor v. Graham*, 490 U.S. 386, 397 (1989).

"The operative question in such cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure,'" *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1542 (2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)), in this case, Officer McCamman's application of deadly force.[7]

"The reasonableness of the use of force is evaluated under an 'objective' inquiry that pays 'careful attention to the facts and circumstances of each particular case.'" *Id.* (quoting *Graham*, 490 U.S. at 396). And "[t]he 'reasonableness' of a particular use of force must be

---

[7] Officer McCamman concedes that his strikes to Braswell's head with a flashlight constituted "deadly force."

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

"Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Mendez*, 137 S. Ct. at 1542.

> 1. **When viewing the facts in the light most favorable to Plaintiff, questions of fact exist as to whether Officer McCamman violated Braswell's Fourth Amendment right to remain free from the application of excessive, deadly force.**

The facts surrounding this claim make it a very close call.

"[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007). Officer McCamman concedes his forceful strikes to Braswell's head is properly "considered deadly force." (*See* ECF No. 77-1 at PageID.490.)

When viewing the facts in the light most favorable to Braswell, his hands were initially underneath his body and he did not comply with the Officer McCamman's order that he put his hands behind his head. (*Compare, e.g.*, ECF No. ECF No. 77-1 at PageID.479 ("When he fell, his hands fell underneath him at his waist area. It was my belief that he was armed at that point . . . . I gave him his commands to show me his hands, put his hands behind his back. I gave him two commands. He did not, at which point I struck him . . . .") *with* ECF

No. 77 at PageID.441 (Q: "[D]o you recall if the officer asked you to put your hands—or to show him your hands or to put your hands behind your back? A: I don't remember. . . . Q: "Is it your memory you were hit in the head before you put your hands behind you? A: Actually, like as soon as I felt the first blow, that's when I put my hands on top.").)

Officer McCamman had reasonable suspicion that Braswell was armed, had his hands in his waist area, and would not show his hands as ordered during the scuffle; thus, McCamman at least initially arguably "ha[d] probable cause to believe that the [Braswell] pose[d] a significant threat of death or serious physical injury . . . ." *Garner*, 471 at 3; *accord Moore v. City of Memphis*, 853 F.3d 866, 871 (6th Cir. 2017) (noting that all that is required to justify deadly force is "that the officer [have] probable cause to believe that the suspect poses a threat of serious physical harm to either the officer or to others").

Indeed, all officers who responded to the call for help had suspicion to believe that Braswell was armed based on the prior caller's description, the high-crime area, the officers' familiarity with some of the individuals in the group, including Braswell's brother, Braswell's immediate flight upon seeing the police, his repeated reaches to his waist area while running and evading, fellow officers' weapons drawn in response to Braswell's actions toward them, and Braswell's ultimate failure to move his hands from his waist area when ordered while on the ground.

However, even assuming Officer McCamman had probable cause—as opposed to mere reasonable suspicion—to apply the first strike to Braswell's head, Braswell was struck with the flashlight in the back of his head and his hands three times over a period of time

after Braswell had placed his hands on the back of his head. Photographs corroborate Braswell's account. (*See, e.g.*, ECF No. 92-3; ECF No. 92-4.)

Thus, the facts and inferences in the light most favorable to Braswell establish that McCamman applied excessive, deadly force to Braswell when he no longer posed a "serious physical threat either to the police or members of the public." *Williams*, 496 F.3d at 487.

Accordingly, the Court must proceed to decide whether Officer McCamman's qualified immunity defense nonetheless warrants summary judgment in his favor on the basis of the second prong: Was Braswell's right to be free from excessive force under these circumstances clearly established at the time of the violation?

> **2.    Plaintiff's Fourth Amendment right to remain free from the application of excessive, deadly force was clearly established, and the law gave Officer McCamman fair notice that his conduct, evaluated by viewing the facts in the light most favorable to Braswell, was unlawful.**

The Supreme Court made clear long ago that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11.

However, "to satisfy the second prong of the [qualified-immunity] standard, plaintiff must show that the right was clearly established in a 'particularized sense,' such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009); *see, e.g., Littlejohn v. Myers*, 2017 WL 1242130, at *4 (6th Cir. 2017) ("Undoubtedly, a suspect's right to be free from excessive force is clearly established. However, it is not appropriate to define a right at such a broad level of generality."); *see also Scott v. Harris*, 550 U.S. 372 , 382 (2007) ("Whatever *Garner* said about the factors that *might have* justified

26

shooting the suspect in that case, such 'preconditions' have scant applicability to this case, which has vastly different facts.").

"[C]ourts must be careful to avoid unduly burdening officers' ability to make split-second decisions." *Bouggess v. Mattingly*, 482 F.3d 886, 893–94 (6th Cir. 2007). With that said, "[e]ven a split-second decision, if sufficiently wrong, may not be protected by qualified immunity." *Id.* at 894. And the law has evolved to the point that "only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville*, 409 F.3d 689, 697 (6th Cir. 2005); *accord Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

Plaintiff extensively relies on *Littlejohn*, but, as Defendants argue, *Littlejohn* was issued this year, after the events in question, and the Officers did not have the benefit of that case. Nonetheless, *Littlejohn* relied upon *Bouggess*, which had been clearly established law for many years prior to the application of deadly force in this case. In *Bouggess*, the Court affirmed "[t]he relevant time for the purposes of th[e] inquiry is the moment *immediately preceding* the shooting." *Id.* at 890 (emphasis added). In other words, if a suspect does not "pose[] an imminent danger of serious physical harm to [the officer] or others" at the moment *immediately preceding* the application of deadly force, then the Officer may not use deadly force. *Id.*; *see, e.g., Sherrod v. Berry*, 856 F.2d 802, 805–06 (7th Cir. 1988); *accord Dickerson v. McClellan*, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996); *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

But not so fast. In certain cases, the Sixth Circuit has sustained the application of deadly force in the "seconds *after* a suspect was no longer a threat." *Rush v. City of Lansing*, 644 F. App'x 415, 422 (6th Cir. 2016) (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)); *see, e.g., Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) ("Within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed."); *Boyd v. Baeppler*, 215 F.3d 594, 602–04 (6th Cir. 2000) (holding an officer is entitled to qualified immunity where he shot the suspect seven times after the suspect had been brought down by another officer's shot).

However, even assuming Officer McCamman had probable cause to apply the first strike to Braswell's head, each of these cases are distinguishable.

In *Mullins*, the Sixth Circuit held it was "not a case where 'a jury could conclude that [the officer] was not in any danger . . .,'" 805 F.3d at 767 (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)), in part because the suspect had his finger on the trigger of a gun and the second shot "came within the time frame in which a reasonable officer could have acted under the perception that [the suspect] was still armed." *Id.* at 768. Likewise in *Untalan*, 430 F.3d at 315. Here, by contrast, Officer McCamman was on top of Braswell and continued to forcefully strike Braswell in his head *and empty hands* after Braswell complied with the Officer's order.

In *Boyd*, the Officer fired "seven more rounds at [the suspect]" because he had not yet, in fact, "dropped his weapon." 215 F.3d at 603. Here, by contrast, Officer McCamman

did not observe Braswell wield a handgun, and after the first strike, Braswell no longer posed *any* threat(—again, when viewing the record in the light most favorable to Braswell).

Finally, in *Rush*, the suspect was in an active scuffle and had "slash[ed] at [the officers] with a knife . . . ." *Id.* at 423. The Court noted that because, "following the first shot, there was no clear or unmistakable surrender, or any other action that would compellingly show that the threat had abated," the officer's continued use of deadly force was reasonable under the circumstances. *Id.* In this case, again, Braswell's hands were on the back of his hands when Officer McCamman forcefully struck him in the head with a flashlight three times. That was at least three times too many. When Officer McCamman was on top of Braswell and Braswell's hands were on his own head, there was "clear [and] unmistakable surrender," and "the threat had abated." *Compare id.*

Moreover, while the Court has concluded the Officers initially had *reasonable suspicion* that Braswell was armed and dangerous, Braswell never in fact brandished any weapon. *See Bouggess*, 482 F.3d at 894. And even assuming Braswell was armed, after he put his hands on the back of his head, he no longer posed a threat to Officer McCamman, who had pinned Braswell down; and Braswell was neither "fleeing" nor "present[ing] a risk to others." *Compare Brosseau v. Haugen*, 543 U.S. 194, 200 (2004). "[D]eadly force is *not* justified" under these circumstances, *Bouggess*, 482 F.3d at 396, at least the circumstances viewed in Braswell's most favorable light.

Thus, the facts in *this* case are more analogous to those in another strain of cases, where a suspect had been subdued or no longer posed a serious risk to the officer when the deadly force was applied. *See Bouggess*, 483 F.3d at 896. Similar to the facts in *Bouggess*,

"[u]nder the facts viewed in the light most favorable to [Braswell], [Braswell] . . . uttered no threatening remarks toward [officers] . . . never drew a weapon . . . struggled with [McCamman] in order to flee . . . did not reach for [McCamman's] gun . . . did not fire [McCamman's] gun . . . fac[ed] away from [McCamman] . . . and . . . was [hit] three times in the back [of the head]." *See id.*

"[E]ven when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified" under these circumstances." *Id.* at 896 (collecting cases); *see also, e.g., Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) (collecting cases) ("We have repeatedly held that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat Phelps after he had been neutralized . . . ."); *Darnell v. Caver*, 156 F.3d 1229, at *3 (6th Cir. 1998) (table) (holding that although officers used reasonable force by applying pepper spray and forcibly removing a suspect from his car, they were not entitled to qualified immunity when they "either pushed [his] head into the pavement or lifted it and let it drop"); *cf. McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) ("But our court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line . . . .").

The Court notes that the four strikes to Braswell's head were in quick succession. By the time Braswell put his hands up to react to the first blow, a jury could conclude the second one may have even been on the way.

However, since Officer McCamman struck him even two more times, including on the back of the hands, "at that moment," Braswell did not "pose[] an imminent danger of serious physical harm to [the officer] or others." *See Bouggess*, 482 F.3d at 889–90. Accordingly, clearly established law provided "fair warning," *Baynes*, 799 F.3d at 612–13, to Officer McCamman that continuing to apply deadly force after Braswell was pinned to the ground, had his hands on the back of his head, and no longer posed a threat to McCamman or others, would violate the Fourth Amendment's prohibition on excessive force.

## C.    Count IV (Assault and Battery) (Officer McCamman)

Over five years ago, the Sixth Circuit sketched out the framework for governmental immunity under state law in the context of intentional torts:

> In *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008), the Michigan Supreme Court stated that the proper method for determining whether governmental immunity applies to intentional torts, such as assault and battery, is to apply the test set forth in *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647 (Mich. 1984). Under the *Ross* test, an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature. *Odom*, 760 N.W.2d at 228. Defendants bear the burden of establishing their entitlement to immunity from plaintiff's state-law claims. *Id.* at 227–28.
> . . . .
> Unlike qualified immunity under federal law, which uses an objective standard, '[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.' Therefore, '[t]he proponent of individual immunity must establish that he acted without malice.' *Id.* at 225. *See also Miller v. Sanilac Cty.*, 606 F.3d 240,

254 (6th Cir. 2010 (applying Michigan law) ("The only factor at issue here is 'good faith,' which is defined as 'without malice.'").

*Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011).

However, under Michigan law, "Plaintiff does not bear the burden of producing direct evidence that the Officers acted with malice." *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 978 (E.D. Mich. 2010). McCamman has not sufficiently shown at summary judgment "that he acted without malice." *Id.* When viewing the facts in the light most favorable to Plaintiff, a jury could conclude that Officer McCamman's additional strikes to McCamman's head— after he no longer posed a threat—were born out of frustration and malice.

### D. Count I (Seizure of Cell Phone) (Officers Mead and McCamman)

This claim arises from the seizure of Braswell's cell phone after his (lawful) arrest— and holding the cell phone in evidence for eight months prior to seeking a search warrant.

Defendants persuasively argue that Plaintiff has produced no evidence that any of the named defendants actually participated in the alleged failure to timely seek a search warrant. It is undisputed that Officer Mead logged the cell phone into evidence after the initial seizure, which was constitutional. *See Riley v. Calif.*, 134 S. Ct. 2473, 2486 (2014). Then, a warrant was sought in February 2015 by an investigating detective. However, Plaintiff has pointed to no evidence in the record indicating why a warrant was not sought immediately or who would have been responsible for doing so. Since the arrest was lawful, the initial seizure was lawful. The fact the cell phone sat for eight months prior to another detective seeking a warrant cannot be chalked up to these defendants.

Finally, any seizure amounted to a *de minimis* invasion of Braswell's' constitutional interests. *See U.S. v. Jacobsen*, 466 U.S. 109, 125–26 (1984) (citing *Cardwell v. Lewis*, 417 U.S. 583, 591–92 (1974)) ("[S]ince the property had already been lawfully detained, the 'seizure' could, at most, have only a *de minimis* impact on any protected property interest.").

## III.   CONCLUSION

This case presents difficult questions. With recognition that this motion has been evaluated "in the peace of a judge's chambers," *Graham*, 490 U.S. at 386 (internal citation omitted), "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In this case, a genuine issue remains for trial on one count of excessive force.

<u>**ORDER**</u>

For the reasons contained in the accompanying opinion, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.

Defendants' motion is granted as to Plaintiff's Fourth Amendment claims for unlawful search, arrest, and property seizure, but factual disputes preclude summary judgment on Plaintiff's Fourth Amendment excessive force claim and state-law battery claim against Officer McCamman.

All other defendants are dismissed from this action.

**IT IS SO ORDERED.**

Date:   June 21, 2017           /s/ Paul L. Maloney
                                Paul L. Maloney
                                United States District Judge